UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

BENJAMIN DWAYNE SWIGER,           )
      Petitioner,                )
                                 )
v.                                 )    Nos.  2:13-CR-102
                                 )           2:15-CV-155
UNITED STATES OF AMERICA,          )
      Respondent.                )

## MEMORANDUM OPINION AND ORDER

Benjamin Dwayne Swiger, ("Swiger" or "petitioner"), a federal prisoner, has filed a motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. Section 2255, [Doc. 41].[1] The government has responded in opposition, [Doc. 43], the petitioner has filed a lengthy, 38-page reply, [Doc.49], and the matter is ripe for disposition. The Court has determined that the files and records in the case conclusively establish that the petitioner is not entitled to relief under § 2255 and, therefore, no evidentiary hearing is necessary. For the reasons set forth herein, petitioner's § 2255 motion lacks merit and will be DENIED and the case DISMISSED.

## I.    Factual and Procedural Background

A criminal complaint was filed on October 9, 2013, [Doc. 3], charging petitioner with receipt (Count One), distribution (Count Two), and possession (Count Three), of child pornography. A federal grand jury returned an indictment on November 13, 2013, [Doc. 18], charging petitioner with distribution of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) (Count One), receipt of child pornography in violation of 18 U.S.C. § 2252A(a)(2) and (b)(1) (Count Two), and possession of child pornography in violation of 18

---

[1] All docket numbers refer to the docket sheet in No. 2:13-CR-102.

U.S.C. § 2252A(a)(5)(B) and (b)(2) (Count Three). On January 21, 2014, a written plea agreement was filed with petitioner agreeing to plead guilty to Count One of the indictment and the government agreeing to dismiss the other two counts. [Doc. 27]. The plea agreement was made pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure and the parties agreed to a sentence of 240 months of imprisonment. [*Id*. at 6]. Petitioner entered his guilty plea on January 21, 2014, sentencing was set for May 14, 2014, and a presentence investigation report ("PSR") was ordered. [Doc. 28].

The PSR was disclosed on April 18, 2014, [Doc. 31]. The probation officer assigned a base offense level of 22 and added two levels pursuant to USSG § 2G2.2(b)(2) because the material involved a prepubescent minor, five levels pursuant to USSG § 2G2.2(b)(3)(B) because the offense involved distribution for receipt, or expectation of receipt, of a thing of value, four levels pursuant to USSG § 2G2.2(b)(4) because the offense involved material that portrays sadistic or masochistic conduct or other depictions of violence, five levels pursuant to USSG § 2G2.2(b)(5) because the defendant engaged in a pattern of activity involving the sexual abuse or exploitation of a minor, two levels pursuant to USSG § 2G2.2(b)(6) because the offense involved the use of a computer, and five levels pursuant to USSG § 2G2.2(b)(7)(D) because the offense involved more than 600 (1,658) images. [*Id*. at ¶¶ 43-49]. The offense level was reduced by three levels pursuant to USSG § 3E1.1(a) and (b), [*Id*. at ¶¶ 55, 56], resulting in a total offense level of 42, [*id*. at ¶ 57]. Petitioner's criminal history category was I, [*id*. at ¶ 62], and the advisory guideline range for imprisonment was 360 months to life. The statutorily authorized maximum, however, was 20 years and the final restricted guideline range was 240 months, the agreed upon sentence. [*Id*. at ¶ 90]. Neither party objected to the PSR, [Docs. 33, 34]. The Court adopted the PSR, accepted the Rule 11(c)(1)(C) plea agreement, and sentenced Swiger to

240 months imprisonment, followed by a lifetime term of supervised release, on May 15, 2014,

[Doc. 28]. Judgment was entered on May 22, 2014, [Doc. 39]. Petitioner did not appeal.

Swiger's plea agreement contained the following stipulation of facts:

> A. At all times relevant to the indictment, the defendant resided at 207 Ridgeview Drive in Johnson City, Tennessee, in the Eastern District of Tennessee. The defendant had access to the internet via service provided by Embarq Communications to the defendant's residence.
> B. The internet is a means of interstate commerce.
> C. At all times relevant to the indictment, the defendant accessed the internet from his residence to join and participate in an online peer-to-peer, password-protected file-sharing application which allowed users to receive and distribute child pornography as defined by 18 U.S.C. § 2256(8).
> D. On September 10, 2013, the defendant distributed 233 still images of child pornography and 19 videofiles of child pornography to an undercover law enforcement officer via the online peer-to-peer, password-protected file-sharing application. In order to distribute the child pornography, the defendant provided the law enforcement officer a password.
> E. When the defendant distributed the foregoing images and videofiles of child pornography on September 10, 2013, he did so knowingly.
> F. The images which the defendant distributed on September 10, 2013 depicted actual minors engaged in sexually explicit conduct.
> G. When the defendant distributed the images on September 10, 2013, he was aware of the sexually explicit nature and character of the materials and he knew they depicted minors engaged in sexually explicit conduct.
> H. The defendant transported the images of child pornography in interstate commerce via the internet, a means of interstate of commerce.

[Doc. 37 at ¶¶ 4A – H]. The PSR had the following additional unobjected to facts:

> 17. The investigation in this case began in June of 2013, when a Special Agent with the Federal Bureau of Investigation (FBI) went online in an undercover capacity, searching for child pornography using a peer-to-peer file sharing application and another person's online identity.
>
> 18. On September 10, 2013, a computer user who used the

screen name "mike.haywood9" invited the undercover agent to participate in a password protected online file sharing network, and provided the agent the password. On that same date, the agent accessed the password protected cache of images from the "mike.haywood9" file and downloaded 233 images and 18 videos of child pornography. The agent determined that the user of account"mike.haywood9" was sharing 1,654 files of child pornography at that time. The agent determined that the user of "mike.haywood9" was a member of GigaTribe, an online peer-to-peer password protected file sharing application and that his internet protocol (IP) address was 76.7.157.223.

19.     The IP address was owned by Embarq Communications, who responded to an administrative subpoena and stated that the account holder was Brandy Swiger, 207 Ridgeview Drive, Johnson City, Tennessee.

20.     On October 9, 2013, the Federal Bureau of Investigation executed a federal search warrant at that address, which is the personal address of Ben and Brandy Swiger and their two-year-old daughter. The defendant was present when the warrant was executed. The agents advised him their reason to be present. The defendant was Mirandized and he signed a written waiver of his constitutional rights. Defendant Swiger stated he became interested in child pornography when he was approximately 12-years-old. He further stated he had been viewing child pornographic images and videos online since he was 18- years-old. The defendant stated he originally used the peer-to-peer (P2P) file sharing program Limewire to locate and download child pornography online by supplying the search terms "pthc," "rbv," and "bibcam." Defendant Swiger informed approximately six months ago, he visited the ZOZO chat website where he learned about another P2P file sharing program known as Gigatribe, which could also be used to obtain child pornography online. He subsequently downloaded Gigatribe and installed the software on his laptop computer.

21.     Defendant Swiger revealed he created a Gigatribe user account with the username "mike.haywood9" and password "Germany69." The defendant stated the username had no significant meaning and was merely a random name. He stated his password represented his deployment to Germany when he served in the United States Army, but the number "69" was a random number. The defendant stated he created a folder labeled "My Downloads" located on his laptop computer, and he used the folder for sharing with Gigatribe users. The "My Downloads" folder was password protected with the password "Germany69." Defendant

Swiger revealed he did not include any personal information on his Gigatribe profile, and no one else had access to the "mike.haywood9" account.

22.     The defendant stated he used Gigatribe roughly once a month to download child pornography, usually whenever he "got feelings." He informed he usually downloaded child pornography on Tuesday evenings, when his wife was at work. Defendant Swiger informed he shared child pornographic images and videos with other Gigatribe users. In turn, downloaded child pornography from other Gigatribe users and stored the files on a gray flash drive. The defendant stated he used Gigatribe's chat feature to communicate with other Gigatribe users to obtain child pornography. He revealed he never exchanged child pornography through e-mail, Skype, or any other social media network.

23.     Defendant Swiger disclosed he never created Gigatribe groups, used Gigatribe points or Gigatribe's blog feature. However, he indicated he was a member of several Gigatribe tribes, including the "KDV" tribe, which was associated with child pornography. He was unable to recall the names of the other tribes he joined. The defendant estimated there were approximately 30 images and two videos depicting child pornography stored on his laptop computer.     He stated he usually deleted the child pornography after viewing the material.

24.     The defendant stated he owned additional computers other than the laptop and desktop computers currently located at his residence. He stated he used the computers to connect the internet to view and download child pornography. The defendant indicated he disposed of the computers after they became outdated; however, he was unable to recall how he disposed of them.

25.     Defendant Swiger was shown printouts of five child pornographic images that were downloaded from the "mike.haywood9" Gigatribe account. The defendant acknowledged he had received and reviewed two of the images, and he initialed the printouts. He stated one printout "looked familiar," but refused to initial the printout. The defendant was also shown three printouts containing information about the "mike.haywood9" Gigatribe account. He verbally acknowledged the information contained on the printouts was correct.

26.     He admitted he received and distributed child pornography via GigaTribe. The defendant denied sexual contact with a child and denied the existence of homemade child pornography on his

computers. Defendant Swiger requested the agents arrest and bring him to the federal courthouse, and he admitted recent ideations of suicide. A review of the computers found onsite was conducted and confirmed the presence of child pornography.

27.     The Federal Bureau of Investigation seized several computers and peripherals. During the forensic examination, the examiner noted the defendant's child pornography collection largely featured images of young boys engaged in sexually explicit conduct. Because of the high incidence of producers in the GigaTribe network, agents were concerned that the defendant had sexually molested a child. The concerns increased when the examiner found several chat sessions in which the defendant discussed and admitted sexually molesting his young nephews.

28.     Additionally, on October 9, 2013, the defendant's wife, Brandy Swiger, was interviewed. She stated she only used the internet on the laptop for Facebook, her e-mail, and her bank account. She stated she didn't think the desktop computer in the basement was operational. Mrs. Swiger revealed she married the defendant three years ago, and they have been together for approximately four years. She informed the defendant worked on computer software, and he did not work from home. She stated he did not spend a lot of time on the computer when he got home, because he worked on computers all day and he did not want to be around them when he got home. Mrs. Swiger revealed she did not know the defendant to have any addictions, to include drugs, alcohol, or pornography. She stated her and Ben started looking into becoming foster care parents, and the defendant told her he "felt burdened to do adoption, and he felt the Lord wanted him to adopt an older kid, like two to five years old." Mrs. Swiger indicated she did not know what Gigatribe or P2P software was, and she didn't know much about computers. She revealed she saw a picture of a naked boy on a computer once. She showed the image to the defendant and he was disgusted. She stated this happened a long-time ago.

29.     On November 18, 2013, agents advised the examination revealed numerous images of what appeared to be the defendant and a young boy engaged in sexually explicit conduct. The United States Attorney's Office reviewed the images and concluded that the images qualified as child pornography because it depicted the lewd and lascivious exhibition of genitalia, and because it involved digital penetration of two young boys' anuses, who were the defendant's nephews. The District Attorney's Office and the Department of Children's Services were notified of the child

sexual contact. It should be noted, a report for risk of abuse was made on seven additional children; however, no other information was provided in regards to these children.

30.     On January 22, 2014, the defendant pled guilty to distributing child pornography, and he was subsequently debriefed. During the debrief, the defendant admitted to photographing and molesting his two nephews, ages five and eight. The defendant stated in the summer of 2013, one of his nephews stayed two consecutive nights at his house. Defendant Swiger revealed he waited until his nephew was asleep before removing his nephew's underwear. The defendant masturbated while "gently rubbing" his nephew's genitals. Defendant Swiger informed he ejaculated on his nephew and took pictures of the incident with his camera. The defendant then downloaded the images to his computer, but later deleted the photographs. Defendant Swiger stated he never shared the images anyone. Approximately one month later, the defendant "touched" another one of his nephews while his nephew stayed overnights at the defendant's residence. As with his other nephew, the defendant indicated he waited until his nephew was asleep before removing his pants. Defendant Swiger "rubbed" his nephews "rear-end," but did not photograph the incident.

31.     The defendant repeatedly assured agents that his nephews had no knowledge of the molestation since they were asleep. Defendant Swiger explained this comment by saying he "watched the children's eyes for movement" while molesting the boys, who appeared to be asleep. The defendant's wife had no knowledge of the molestation.

32.     Additionally, during the interview on January 22, 2014, the defendant revealed he first came in contact with child pornography in 2007, while stationed in Germany and serving in the United States Army. He informed he borrowed a fellow soldier's laptop before performing 24-hour guard duty. The defendant stated he and other soldiers were reviewing the movies stored on the laptop when they came across a movie labeled "Mom and 8yo son." The defendant and others watched the movie before returning the computer to its owner. The movie depicted a young boy, who appeared to be eight years old, having sex with an adult female. Defendant Swiger was unable to recall the name of the soldier who provided him the computer or the names of the soldiers who watched the movie with him. He revealed a couple of soldiers in his battalion obtained and viewed child pornography on a regular basis using the P2P software application Limewire. The defendant downloaded and installed Limewire on his personal laptop

computer and supplied the search term "child pornography" into Limewire's search engine. This was done to locate child pornography online. Defendant Swiger was unable to recall the names of the aforementioned soldiers even though he served with the individuals throughout a majority of his military career, including a combat tour in Iraq.

33.     After Limewire was discontinued, the defendant stated he began using the P2P software application Frostwire, Gigatribe and Ares to download child pornography. The defendant supplied the search terms "preteen," "pthc," bibcam," "p101," "rbv," and "lmn" into Frostwire's search engine to located child pornography online. Defendant Swiger stated he never emailed child pornography to anyone or communicated with anyone about child pornography, accept through Gigatribe and the ZOZO chat website. The defendant was interested in viewing images/videos of children between the ages of six and 13 years of age.

34.     Defendant Swiger was "interested" in children who lived in his neighborhood that "played on the other street." The defendant stated he never approached the children and never acted upon his "interests."  He was unable to recall the children's names.

35.     During the interview on January 22, 2014, the defendant stated he was molested by his maternal grandfather for at least two years.  The molestation began when the defendant was approximately seven or eight years old. Defendant Swiger revealed he performed oral sex on his grandfather on several occasions. The defendant stated his grandfather also attempted to rape him, but his grandfather was unsuccessful. Defendant Swiger informed his grandfather abruptly stopped molesting him and became distant. His grandfather died when the defendant was 12 or 13 years old, possibly from heart disease. The defendant informed he never told his parents or brothers about being molested by his grandfather. His grandfather had molested the defendant's mother when she was a child and the defendant did not want to upset his mother.

36.     The defendant stated he was also molested by a "neighborhood guy" while living in West Virginia. He informed the guy stated he would give the defendant a bicycle if the defendant would show him his penis, to which the defendant agreed. The individual masturbated and performed oral sex on the defendant. Defendant Swiger revealed he was 12 or 13 years old at the time, and he couldn't recall the name of the individual.

37.     Based upon the negotiated Plea Agreement, the defendant

> will be held accountable for the distribution of 233 still images and
> 19 video files which depicted minors engaged in sexually explicit
> conduct via his personal computers. The images included children
> engaged in sexual intercourse with adult males, masturbation,
> sadistic and masochistic abuse, bondage, and the lascivious
> exhibition of the genitals and pubic areas.

[Doc. 31 at ¶¶ 17 – 37].

## II.    Standard of Review

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255.    Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief.  If it plainly appears the movant is not entitled to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo,* 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States*, 285 F.2d 733, 735 (6th Cir. 1961).  "Conclusions, not substantiated by allegations of fact with some probability of verity,  are not sufficient to warrant a hearing."  *O'Malley*, 285 F.2d at 735 (citations omitted).  A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit.  *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson,* 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings.  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case);

*Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying Brecht to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*, 582 F. 2d 1039, 1041 (6th Cir.), cert. denied, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), cert. denied, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

## III.    Analysis

Petitioner alleges three broad basis for relief under § 2255 and within each broad claim there appear to be many, more narrow allegations. The three broad claims, all asserting constitutionally ineffective assistance of counsel, are:

(a)    Counsel rendered constitutionally ineffective assistance in advising Swiger on guilty plea;

(b)    Counsel rendered constitutionally ineffective assistance by failing to investigate defenses; and

(c)    Counsel failed to protect Swiger from use of protected admissions at sentencing.

[Doc. 41 at 4-5, 7]. The Court will address each of these claims in turn below.

When a § 2255 Petitioner claims he was denied his Sixth Amendment right to effective assistance of counsel, it is noted that an attorney is presumed to have provided effective assistance, and the Petitioner bears the burden of showing that the attorney did not, *Mason v. Mitchell*, 320 F.3d 604, 616-17 (6th Cir. 2003). Petitioner must prove that specific acts or omissions by his attorney were deficient and that the attorney failed to provide "reasonably

effective assistance," *Strickland v. Washington,* 466 U.S. 668, 687 (1987), which is measured by "prevailing professional norms," *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). If Petitioner crosses this evidentiary hurdle, he must then show "a reasonable probability that, but for [the attorney's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. In other words, he must show that he was prejudiced by the attorney's deficient representation:

> To succeed on an ineffective assistance claim, a defendant must show that counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). [A court's ] review of counsel's performance is "highly deferential." Id. at 689, 104 S.Ct. 2052. [The court must] "judge the reasonableness of the time of counsel's conduct." *Id*. at 690, 104 S.Ct. 2052. The defendant "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. To establish "prejudice," a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694, 104 S.Ct. 2052. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. ——, 131 S.Ct. 770, 792, 178 L.Ed.2d 624 (2011). And, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland*, 466 U.S. at 697, 104 S.Ct. 2052.

*Docherty v. United States*, 536 Fed. Appx. 547, 551 (6th. Cir. 2013).

### A.    Counsel's Advice on Guilty Plea

Petitioner claims that counsel, prior to negotiating the Rule 11(c)(1)(C) plea agreement, was ineffective in the following ways: (1)  not explaining to Swiger "what his advisory Guidelines range might be," (2) did not investigate the "facts and law" as to whether the offense was "triggered by PTSD," (3) not explaining "to Swiger that his sentence would be guided by the advisory Sentencing Guidelines" but rather presented the 11(c)(1)(C) agreement "as the only offer

the government would make," (4) was not advised that an alternative to the 11(c)(1)(C) plea agreement "was a deal that left sentencing to the court," and (5) was not advised that "the Guidelines enhancements to the base offense level were subject to challenge." [Doc. 41 at 4].

Swiger claims that, had he been properly advised on these matters, "he would have demanded a plea agreement without the 11(c)(1)(C) limitations, or even considered pleading guilty without a plea agreement," would have [fought] to establish an appropriate advisory Guidelines range," and "left sentencing to the court." [Doc. 49 at 9-10]. More specifically, he "would have challenged the proposed Guidelines enhancements and sought favorable Guidelines reductions for the effect of his war-induced PTSD on his commission of the offense." [*Id*. at 10]. Petitioner then argues that, because the guidelines were advisory, the child pornography guidelines "are subject to diminished deference," [*id*. at 12], and not based on empirical data, and there were at least two grounds for downward departure, i.e., USSG §§ 5H1.11 and 5H1.3, he would have received a lighter sentence.

Petitioner's argument suffers from several flaws and in many ways is contradicted by the record. First of all, petitioner's claim that he was not advised about his potential advisory guideline range is refuted by the record. Swiger was advised by the Court at his change of plea hearing that his advisory guideline range would be considered by the Court in determining whether to accept his Rule 11(c)(1)(C) plea agreement. He affirmed under oath that he and his attorneys had "talked about how the advisory guidelines might apply to his case."[2] Petitioner likewise confirmed his understanding that the advisory guideline range could not be determined until after a PSR was completed by the United States Probation Office and that both he and the government had the right to object to any of the contents of the PSR. He further stated his

---

[2] No transcript of the change of plea hearing has been filed. None is needed, however, and this quoted language comes from the standard script the Court follows in every change of plea hearing.

understanding that all of the 18 U.S.C. § 3553(a) factors would be considered by the Court in determining whether to accept the plea agreement. Maybe most importantly, though, petitioner was clear that he understood that he was agreeing to a sentence of 240 months of imprisonment, the statutory maximum for Count One, thus largely rendering the advisory guideline range irrelevant if the Court accepted the plea agreement. In fact, the Court recalls expressing some surprise that petitioner had agreed to the statutory maximum and counsel explained, in petitioner's presence, that by agreeing to the statutory maximum on Count One, petitioner was trying to avoid a potentially much longer sentence if tried and convicted of all charges in the indictment. In short, petitioner preferred the certainty of an agreed upon 240 months over the risk of a possibly much higher sentence.[3] In addition to all that, petitioner acknowledged to the Court at his sentencing hearing that he had received and read the PSR and discussed it fully with counsel. He never took issue with the probation officer's calculation of the guideline range, never sought to withdraw his guilty plea, and acquiesced in counsel's request that the Court accept the plea agreement and impose the agreed upon sentence. [*See* Doc. 32 at 2].

As for petitioner's argument that counsel did not investigate the "facts and law" as to whether his offense was triggered by his PTSD, he has not offered any facts to show that **his** offense was in fact triggered by his PTSD. He has not offered the opinion of any qualified medical professional or provided any medical records; rather, he points simply to his traumatic combat experience while serving in the military in Iraq, which he states "is likely to have substantially surpassed the combat records of prior veterans." [Doc. 49 at 24]. It is not surprising that petitioner's commendable, but traumatic, experience left him with PTSD. Petitioner points to

---

[3]  It appears that the defendant would have faced at least a statutory maximum of 40 years if convicted of both counts One and Two or 50 years if convicted of all three. *See United States v. Dudeck*, 657 F.3d 424 (6th Cir. 2001) ("possession of child pornography is generally a lesser-included offense of receipt of child pornography," but "[c]onviction under both statutes is permissible if separate conduct is found to underlie the two offenses.").

studies about the general impact on military veterans of PTSD, the rates at which combat veterans from Vietnam were charged with criminal offenses, studies which have found a link between military service and sex addiction, and the increasing use of PTSD as a legal defense or mitigating factor at sentencing. [*See* generally *id*. at 25-30]. What is missing, however, is some link between petitioner's ***own*** experiences and ***his*** offense of conviction. In short, nothing here supports petitioner's conclusory claim that PTSD somehow triggered the commission of these offenses.

Petitioner also cites numerous cases where sentencing judges have afforded leniency to veterans of military service. [*Id*. at 30-32]. That is certainly true, and this Court has done likewise. None of that, however, as the government points out, ***entitles*** a combat veteran to a lesser sentence on that basis. [Doc. 43 at 5 (citing *United States v. Sims*, 511 Fed. App'x 429, 430-31 (6th Cir. 2013)]. In any event, the Court was well aware of petitioner's military service, including combat service, and his diagnosis of PTSD related to that service, [Doc. 31 at ¶¶ 74-75, 80-81; *see also* Doc. 32 at 5-6]. Nevertheless, the Court found the 240-month agreed upon sentence to be appropriate when it accepted the Rule 11(c)(1)(C) plea agreement. Given the seriousness of petitioner's offense involving distribution of a significant number of images of child pornography, as well as possession of "numerous images of what appeared to be the [petitioner] and a young boy engaged in sexually explicit conduct," [Doc. 31 at ¶¶ 12, 29], and his molestation of his two young nephews, ages 5 and 8, it is unlikely the Court would have imposed a sentence of less than 240 months and petitioner can show no likelihood or probability otherwise.

Petitioner's claim that he was not advised by counsel "that his sentence would be guided by the advisory Guidelines" but rather presented the 11(c)(1)(C) agreement "as the only offer the government would make," is somewhat difficult to decipher. To the extent petitioner claims he did not know that his sentence would be determined, at least indirectly, by the advisory

guidelines, that claim is flatly contradicted by the record in that petitioner was advised by the Court that it was required to consider the guideline range before determining the sentence and his own counsel's explanation to the Court in his presence of the reason for the agreement on the maximum sentence as to Count One. The claim that counsel told him the 11(c)(1)(C) agreement was the only offer the government would make likewise affords him no basis for relief. First of all, petitioner has not shown, nor even argued, that the government would have offered a more favorable plea agreement. Secondly, neither petitioner nor counsel could have demanded a more favorable agreement or compelled the government to acquiesce to such a demand as criminal defendants have "no constitutional right to plea bargain." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1977).

Next, petitioner claims that he was not advised that an alternative to the 11(c)(1)(C) agreement "was a deal that left sentencing to the Court." It is difficult to see any possible ineffective assistance here since petitioner himself acknowledges that the 11(c)(1)(C) agreement was the only "deal" the government would offer. He makes no showing that the government would have offered or even considered the same deal, i.e., plead guilty to Count One with Counts Two and Three dismissed, with sentencing left to the Court. Furthermore, if petitioner is suggesting that he could have pled guilty to all three counts of the indictment, he certainly could have done so and sentencing would then have been left to the Court. That course, however, would have exposed him to the very risk he was trying to avoid if he agreed upon a sentence in the first place, that is, the threat of a potentially ***much higher*** sentence. He makes no plausible showing that he would have done so.

Finally, petitioner claims that he was not advised by counsel that he could challenge enhancements to the base offense level under the guidelines. Whether he was or not, the record

clearly reflects that he was so advised by the Court at his change of plea hearing. Petitioner acknowledged, under oath, that he understood that his advisory guideline range could not be determined until a PSR was prepared and both he and the government had the opportunity to "challenge" or, object to, its contents.[4]  In any event, Swiger has not shown, and has made little effort to show, that any of the enhancements could have been successfully challenged.

As noted above, a petitioner claiming ineffective assistance of counsel must show both deficient performance and prejudice, i.e., "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688.  In the guilty plea context, prejudice means that, "but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).  Even if petitioner could show deficient performance here, he cannot show prejudice, despite his claims that he would have pled guilty without a plea agreement or gone to trial, challenged the guideline calculation, sought a reduction for his combat-related PTSD, and ultimately receive a lighter sentence.  "In the Sixth Circuit, a petitioner cannot make [the necessary] showing merely by telling the court now that []he would have gone to trial then if []he had gotten different advice." *Shimel v. Warren*, 838 F.3d 685, 698 (6th Cir. 2016) (bracketing and quotation marks omitted).  Nor can petitioner "base a claim of prejudice on the mere opportunity to make the same decision again with different information."  Rather, he "must demonstrate a reasonable likelihood that, had he [received proper advice], he would have, in fact, rejected the plea and proceeded to trial." *Moore v. United States*, -- Fed. App'x --, 2017 WL 129035 (6th Cir. Jan. 13, 2017).  As noted by the Sixth Circuit in *Moore*:

> The standard for prejudice in this context is objective. *Pilla v. United States*, 668 F.3d 368, 373 (6th Cir. 2012).  Thus, "to obtain

---

[4]  Once again, no transcript of the change of plea hearing has been filed in the record but the Court advises *every* defendant in *every* change of plea hearing of this right.

16

> relief on this type of claim, a petitioner must convince the court that
> a decision to reject the plea bargain would have been rational under
> the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010).
> A rational person would consider, not just the advantages of
> proceeding to trial (the prospect of a possible, though unlikely,
> lighter sentence), but also the disadvantages

2017 WL 129035, at * 2.
.

Here, a decision to reject the 11(c)(1)(C) plea agreement would have resulted in loss of the government's promise to dismiss the remaining counts and the certainty of the agreed upon sentence of 240 months, while avoiding the possibility of conviction on multiple counts and the possibility of the Court imposing consecutive sentences. To the extent Swiger's case for prejudice is based on his hope of receiving a below guideline range sentence, "he fails to account for the anchoring effect of the Guidelines range." *Id.* (citing *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013) ("[S]entencing decisions are anchored by the Guidelines.")). Swiger assumes the Court would have ignored the guidelines and varied downward to impose a sentence of less than 240 months, well below the advisory guideline range of 360 months to life. To the extent Swiger bases his prejudice claim on his ability to successfully challenge the probation officer's calculation of the range, he has shown no reasonable possibility of achieving that. Petitioner appears to focus on the five-level enhancement applied pursuant to USSG § 2G2.2(b)(5) because petitioner admitted to molesting his two young nephews on separate occasions, which Swiger claims was improperly based on his own admissions from a law enforcement debriefing. [See Doc. 49 at 6, 35-41 ("but for this adjudtment Swiger's advisory Guidelines Total Offense Level would have been 37, and the sentencing range would have been 210-262 months.")].[5] A review of the PSR reveals, however, that the enhancement would very likely have ultimately been applied even without petitioner's admissions. During the November, 2013 forensic evaluation of

---

[5] Petitioner acknowledges that the sentence imposed pursuant to his 11(c)(1)(C) agreement was within this range.

petitioner's computer, investigators found numerous images of Swiger and a young boy engaged in sexually explicit conduct. The images depicted lewd and lascivious exhibition of the genitalia, i.e., ***digital penetration of two young boys anuses***. These two boys were identified as the petitioner's nephews. [Doc. 31 at ¶ 29]. In addition, the forensic examiner "found several chat sessions in which the [petitioner] discussed and admitted sexually molesting his young nephews." [*Id*. at ¶ 27]. Thus it appears that Swiger did no more in his debriefing than confirm what the investigators already knew or would clearly have discovered in short order. In light of all this, it would have been irrational for Swiger to reject the 11(c)(1)(C) agreement and it is not reasonably probable he would have done so. Consequently, petitioner has failed to establish prejudice.

**B.     Counsel's Failure to Investigate**

Swiger asserts that he informed counsel, "immediately upon hiring counsel" of the "well established," "link between PTSD and sex offenses," and, had counsel properly investigated, petitioner would have received "a more beneficial plea deal and a lighter sentence." [Doc. 41 at 5]. As noted above, petitioner points to studies about the general impact of PTSD on military veterans, the rates at which combat veterans from Vietnam were charged with criminal offenses, studies which have found a link between military service and sex addiction, and the increasing use of PTSD as a legal defense or mitigating factor at sentencing. What is missing, however, is some link between petitioner's **own** experience and **his** offense of conviction. Petitioner also cites numerous cases where sentencing judges have afforded leniency to veterans of military service. That is certainly true, and this Court has done likewise. None of that, however, as the government points out, ***entitles*** a combat veteran to a lesser sentence on that basis. In any event, the Court was well aware of petitioner's military service, including combat service, and his diagnosis of PTSD related to that service. Nevertheless, the Court found the 240-month agreed upon sentence

18

to be appropriate when it accepted the Rule 11(c)(1)(C) plea agreement. Given the seriousness of his offense involving distribution of a significant number of images of child pornography as well as possession of "numerous images of what appeared to be the [petitioner] and a young boy engaged in sexually explicit conduct," [Doc. 31 at ¶¶ 12, 29], and his molestation of his two young nephews, ages 5 and 8, it is unlikely the Court would have imposed a sentence of less than 240 months and petitioner can show no likelihood or probability otherwise.

Swiger has not carried his burden of showing either that counsel's performance was deficient or that he was prejudiced in any way.

### C. Failure of Counsel to Protect Petitioner From Use of Protected Admissions at Sentencing

Swiger argues that statements and admissions made by him in a debriefing with federal agents were later used against him at sentencing and in state court proceedings. He asserts that counsel advised him to be truthful without advising him that he could remain silent without jeopardizing his reduction in guidelines range for acceptance of responsibility under USSG § 3E1.1. He further claims that, had he been properly advised, he would not have answered questions and would not "have experienced a five-level enhancement for conduct involving sexual abuse or exploitation of minor, and he would not have been prosecuted for state offenses." [Doc. 41 at 7].

It is true, as petitioner claims, that there appears to have been no benefit to petitioner from the debriefing. It was not required by the plea agreement and the reason for the debriefing is not apparent in the record. Even assuming counsel was somehow deficient , however, Swiger can show no prejudice as to this claim. He first argues that he received a five-level enhancement for conduct involving sexual abuse of a minor pursuant to USSG § 5G2.2(b)(5) which he would not otherwise have received. As set forth above, although the probation officer references Swiger's

admissions in the PSR, clear evidence of petitioner's abuse of his nephews was found on the computer seized by the FBI for forensic examination. The five-level enhancement was fully justified without reference to anything said by petitioner in the debriefing. Additionally, as the government notes, even if the admissions made during the debriefing formed the basis for the five-level enhancement, petitioner's sentence was not based on the guidelines range but rather was based on his Rule 11(c)(1)(C) plea agreement. *See, e.g., Freeman v. United States*, 131 S. Ct. 2685, 2695 (2011) (Sotomayor, J. concurring) ("the term of imprisonment imposed by a district court pursuant to an agreement authorized by Federal Rule of Criminal Procedure 11(c)(1)(C) is based on the agreement itself, not on the . . . calculation of the Sentencing Guidelines.").

As for Swiger's claim that he would not have been prosecuted in state court for state offenses, the Court agrees with the government that Swiger has offered no factual support for the claim. The Court notes, however, that, to the extent the state prosecution rested upon the allegations of sexual abuse of petitioner's nephews, the evidence found during the forensic examination of his computers was likely sufficient to support that prosecution. Simply put, petitioner has suffered no prejudice as a result of his admissions.

## IV.    Conclusion

For the reasons set forth above, the Court holds that neither petitioner's prosecution in this court nor his sentencing was in violation of the constitution or laws of the United States and he is not entitled to an evidentiary hearing. His motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255, [Docs.41], is DENIED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth

Circuit Court of Appeals disapproves of the issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F. 3d 466 (6th Cir. 2001). The District Court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standard set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000). *Id.*

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that petitioner's claims are adequate to deserve further review. Because petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.

A separate judgment will enter.

ENTER:

s/J. RONNIE GREER<br>
UNITED STATES DISTRICT JUDGE